Filed 5/27/20
# CERTIFIED FOR PARTIAL PUBLICATION*
## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B293030 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA141014) |
| v. | |
| ANDRES LIMA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Allen J. Webster, Judge. Affirmed as modified and remanded for further proceedings.

C. Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Acting Senior Assistant Attorney General, Steven D. Matthews, Idan Ivri, and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of the Discussion parts A, B, D, and E.

1

# I.  INTRODUCTION

A jury convicted defendant and appellant Andres Lima of the attempted willful, deliberate, and premeditated murder of Israel R. (Pen. Code, §§ 664/187, subd. (a)[1]) and the assault of Omar O. by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)).  The jury found true the allegations that in the commission of the attempted murder, a principal personally used and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b)-(d) & (e)(1)) and defendant committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subds. (b)(1)(C) (attempted murder) & (b)(1)(A) (assault)).[2]  Defendant admitted he served two prior prison terms.  (§ 667.5, subd. (b).)  The trial court sentenced defendant to 32 years to life in state prison.

On appeal, defendant contends we must reverse his conviction for attempted murder in light of Senate Bill No. 1437 which abrogated the natural and probable consequences doctrine; even if Senate Bill No. 1437 did not abrogate the natural and

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

[2]     The jury was unable to reach verdicts as to codefendants Daniel Gutierrez and Raymundo Hernandez, who also were alleged to have committed willful, deliberate, and premeditated attempted murder and assault by means of force likely to produce great bodily injury with the accompanying firearm and gang allegations, as well as other alleged enhancements specific to those defendants.

probable consequences doctrine as to attempted murder, the trial court erred in failing to instruct the jury that a premeditated and deliberate attempted murder had to be a natural and probable consequence of the target crime; the prosecutor committed misconduct by using prospective jurors' comments to bolster the prosecution's factual theories and inflame the jury's passions and biases; remand is warranted to allow the trial court to exercise its discretion whether to strike the firearm enhancements pursuant to section 12022.53, subdivision (h); and he is entitled to 116 days of conduct credit. We remand the matter to the trial court so it may exercise its discretion whether to strike any of defendant's section 12022.53 firearm enhancements, order the sentencing minute order modified to reflect that defendant was awarded 116 days of conduct credit, and affirm the judgment in all other respects.

## II.    BACKGROUND[3]

A.    *The Prosecution's Case*

1.    <u>The Fight and Shooting</u>

At around 10:00 a.m. on July 17, 2016, 16-year-old Israel O. had a dispute on Facebook with another minor, Miguel R., during which Miguel challenged Israel to a fight at the Rosecrans Recreational Center, a park. Israel agreed. Israel wanted "backup," so he asked his brothers Aaron O. and Omar O. and

---

[3]    Because Gutierrez and Hernandez are not parties to this appeal, our recitation of facts focuses on those related to defendant and the issues he raises on appeal.

Omar's friend Alvaro Q. to accompany him.[4]  At about 12:45 p.m. that day, Israel and the others went to the Rosecrans Recreational Center.

The Rosecrans Recreation Center was in the Gardena 13 gang's territory.  Neither Israel nor Miguel was a gang member.  Omar, Aaron, and Alvaro also were not gang members.

After arriving at the park, Israel and the others sat on a bench.  Israel got up to put his sweatshirt in Aaron's car.  As Israel walked to Aaron's car, two groups of people approached him.  The groups totaled 10 people and consisted mostly of Hispanic males.  Defendant approached Israel and said, "'Where the shoelaces at?'"  "Shoelaces" was a derogatory term that referred to South Los gang members.  South Los and Gardena 13 were rival gangs.  Defendant then asked Israel where he was from.  Israel, who understood defendant to be asking to which gang he belonged, did not respond.  Defendant punched Israel in the face multiple times.  Israel defended himself.

Omar and Aaron ran to assist Israel and became involved in fights with defendant's companions.  Omar approached the group and said, "[W]hoa, stop, what's happening?"  He heard someone say "'Nah, fuck that'" and was then struck in the face and the back of the head, multiple times, by two of defendant's companions.  Omar could not identify his attackers.  He suffered a cut to his left eyebrow and lost vision in his left eye for some period of time.

---

[4]     Israel testified that he did not tell his brothers that he was going to the park to fight someone because he believed they would not take him.  Omar testified that Israel told him about the planned fight with Miguel.

Aaron heard defendant say, "'This is Gardena.'" Aaron responded, "'I don't bang.'" Alvaro saw a man other than defendant make a gang sign with his hand and heard him say, "'Gardena'" and "'Fuck your dead homies.'"

At the same time, Alvaro approached Miguel, whom he knew, to ask what was taking place. They argued and attempted to fight, but a woman with a baby interceded.

At some point, defendant picked up Israel by the legs and slammed him to the ground. Defendant picked up Israel again and pinned his arms behind his back. On direct examination, Israel testified that defendant then said, "'Get the burner.'" Israel understood a "burner" to be a gun. On cross-examination, Israel testified he was not sure if he heard the word "burner" or if defendant used that word. On redirect examination, Israel explained that he was having trouble remembering, given the passage of time. When he told a detective in July 2016 that defendant said, "'Get the burner,'" he was very clear.

Omar testified that he heard defendant say, "'Get the burner, get the burner, come shoot him.'" Aaron testified that he heard defendant or one of his codefendants say something like, "'Take out the strap,'" or "'Take out the burner.'" He understood "strap" or "burner" to be a gun. Aaron heard defendant say—referring to Israel—"Shoot him . . . ."

A juvenile, Leonardo E., shot Israel in his lower abdomen. Leonardo said something about the number 13, and defendant and his companions ran away.

A three-second video of part of the incident at the park was provided to the police. Los Angeles Police Department Detective Christian Mrakich showed the video to Gardena Police Department Officer Jason Hooker and Los Angeles Police

Department Officer Joseph Chavez who identified, among others, defendant and Leonardo from the video.

2. <u>Gang Evidence</u>

In July 2016, Officer Hooker worked in a unit that handled all gang-related crimes in Gardena. Gardena 13 was the largest gang in Gardena. The number 13 in the gang's name showed it was "paired up" with the Mexican Mafia. Officer Hooker opined that defendant and Hernandez were members and Leonardo was an associate of the Gardena 13 gang.

Officer Chavez testified as the prosecution's gang expert. As a member of the Los Angeles Police Department's gang unit, one of the gangs he was assigned was the Gardena 13 gang. Officer Chavez opined that Gutierrez was an associate and defendant, Hernandez, and Leonardo were members of Gardena 13. Defendant and Hernandez stipulated that they were members of Gardena 13.

Officer Chavez testified that the inquiry, "'Where are you from'" is gang-related and usually leads to a confrontation or an altercation. According to Officer Chavez, veteran gang members use juvenile gang members—veterans know that juveniles will not receive the same punishment for committing the same crimes as adults. "Up-and-comer[s]" in a gang "have to show that they're willing to do what the older members ask of them and be who the older members want them to be."

The prosecutor gave Officer Chavez a set of hypothetical facts based on the facts in this case and asked if the attempted murder and assault were committed for the benefit of, at the direction of or in association with the Gardena 13 gang, with the

specific intent to promote, further, or assist in any criminal conduct by gang members. Officer Chavez testified that the shooting in the hypothetical was committed for the benefit of, in association with, and at the direction of Gardena 13.

B.    *The Defense Case*[5]

Martin Flores testified as a gang expert for Gutierrez.[6] He testified that he was one of 12 non-law enforcement gang experts on the Los Angeles County Superior Court's panel. He grew up in East Los Angeles where he was exposed to gangs. As an adult, he worked throughout Los Angeles County to divert young people from gang participation. Later, he worked with high risk and incarcerated young people through a conference he developed called "Wake Up, It Ain't No Game." Flores "work[ed] a lot" as a gang expert and earned $220,000 the previous year.

Flores testified he was familiar with the case. He had read the police reports and listened to some of the testimony. He opined that simply because Gutierrez lived in an area where gang members lived and spoke to people in that area did not make Gutierrez a gang associate. Flores believed that Gutierrez was not a Gardena 13 associate or member. Gutierrez was not at the Rosecrans Recreational Center in a gang capacity; he was there with other members of the community, a couple of whom had

---

[5]    None of the defendants testified at trial. Neither defendant nor Hernandez called any witnesses.

[6]    Derek Ibanez also testified for Gutierrez. Because his testimony is not relevant to the issues on appeal, we do not summarize it here.

gang histories. Like Gutierrez, those community members were not at the park in a gang capacity.

Flores explained that the fight and shooting resulted from a personal conflict and were not gang related. The victim and his companions were not gang associates or members. Leonardo did not have gang tattoos and testimony about his gang status was speculation.

On cross-examination, the prosecutor told Flores to assume that the first thing the person who was shot was asked was, "Where are you from?"; Gutierrez was actively involved in the fight and threw punches; he threw up a "G"; he said, "Gardena"; he said, "[F]uck your dead homies" at the beginning of the fight; and he said, "[S]hoot him" and asked if that was enough to change his opinion that Gutierrez was not a gang associate or member. Flores said it would not change his opinion without further information. Flores explained that the inquiry, "'[W]here are you from?'" is not automatically a gang challenge and may be an attempt to recall a person's identity.

## III.  DISCUSSION

A.  *Senate Bill No. 1437*

Defendant contends we must vacate his willful, deliberate, and premeditated attempted murder conviction, which rested on a natural and probable consequences theory of aiding and abetting, in light of Senate Bill No. 1437 which abrogated the natural and probable consequences doctrine. Whether Senate Bill No. 1437 applies to attempted murder is pending before the California Supreme Court. (*People v. Dennis* (2020) 47

8

Cal.App.5th 838, 844.) We agree with those cases that hold Senate Bill No. 1437 does not apply to attempted murder. (See e.g., *People v. Dennis, supra,* 47 Cal.App.5th at p. 844; *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1106, review granted Nov. 13, 2019, S258175 ["As a matter of statutory interpretation, Senate Bill [No.] 1437's legislative prohibition of vicarious liability for murder does not, either expressly or impliedly, require elimination of vicarious liability for attempted murder"].)

B.  *The Trial Court's Failure to Instruct on Premeditation and Deliberation*

Defendant contends that if we do not hold that Senate Bill No. 1437 abrogated the natural and probable consequences doctrine as to attempted murder, we still must reverse his conviction for willful, deliberate, and premeditated attempted murder because the trial court erred in failing to instruct the jury that *premeditated* and *deliberate* attempted murder had to be a natural and probable consequence of the target crime.[7]

---

[7]  The trial court instructed the jury on the natural and probable consequences doctrine as to attempted murder with CALCRIM No. 403 as follows:

"To prove that the defendant is guilty of Attempted Murder under a theory of Natural and Probable Consequences, the People must prove that:

"1.  The defendant is guilty of Disturbing the Peace: Fighting or Challenging Someone to a Fight;

"2.  During the commission of Disturbing the Peace: Fighting or Challenging Someone to a Fight, a co-participant in that Disturbing the Peace: Fighting or Challenging Someone to a Fight committed the crime of Attempted Murder;

9

Defendant concedes that "[t]he instruction given was consistent with" the California Supreme Court's holding in *People v. Favor* (2012) 54 Cal.4th 868" (*Favor*) ["Under the natural and probable consequences doctrine, there is no requirement that an aider and abettor reasonably foresee an attempted premeditated murder as the natural and probable consequence of the target offense. It is sufficient that attempted murder is a reasonably foreseeable consequence of the crime aided and abetted, and the attempted murder itself was committed willfully, deliberately and with premeditation"], but argues that "decisions since *Favor* placed it

---

"AND

"3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the Attempted Murder was a natural and probable consequence of the commission of the Disturbing the Peace: Fighting or Challenging Someone to a Fight.

"A *co-participant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"To decide whether crime of Attempted Murder was committed, please refer to the separate instructions that I have given you on those crimes.

"The People are alleging that the defendant originally intended to aid and abet Disturbing the Peace: Fighting or Challenging Someone to a Fight. If you decide that the defendant aided and abetted that crime and that Attempted Murder was a natural and probable consequence of that crime, the defendant is guilty of Attempted Murder. You do not need to agree about which of these crimes the defendant aided and abetted."

10

on shaky ground and the Legislative message conveyed by [Senate Bill No.] 1437 topples it completely. *Favor* can no longer be viable."

### 1.     Standard of Review

We apply the de novo standard of review when assessing whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

### 2.     Analysis

In support of his argument, defendant cites *People v. Chiu* (2014) 59 Cal.4th 155, 167 (*Chiu*), in which the California Supreme Court concluded that a first degree premeditated and deliberate murder conviction for an aider and abettor cannot be based on the natural and probable consequences doctrine as a matter of law. Defendant concedes that his argument is contrary to the California Supreme Court's holding in *Favor, supra*, 54 Cal.4th 868, that *Chiu* cited but did not overrule *Favor*, and that we are bound by *Favor*.

There is a split of authority as to whether *Chiu's* holding applies to premeditated attempted murder convictions. (Compare *People v. Mejia* (2019) 40 Cal.App.5th 42, 43 [concluding that the trial court "improperly instructed the jury on premeditated attempted murder under the natural and probable consequences doctrine"] with *People v. Gallardo* (2017) 18 Cal.App.5th 51, 85 ["[s]imply put, there is no language in *Chiu* that overrules or otherwise questions the continuing validity of . . . *Favor*"].) This issue is currently pending before the California

11

Supreme Court.  (*People v. Lopez* (Aug. 21, 2019, B271516, review granted Nov. 13, 2019, S258175) [rehearing petition granted on two questions, including:  "In order to convict an aider and abettor of attempted willful, deliberate and premeditated murder under the natural and probable consequences doctrine, must a premeditated attempt to murder have been a natural and probable consequence of the target offense?  In other words, should [*Favor, supra,*] 54 Cal.4th 868 . . . be reconsidered in light of *Alleyne v. United States* (2013) 570 U.S. 99 . . . [(*Alleyne*)] and [*Chiu, supra,*] 59 Cal.4th 155 . . . ?"].)

The Attorney General argues that we are bound by stare decisis to follow *Favor, supra*, 54 Cal.4th 868 and affirm the conviction for attempted premeditated murder.  (*People v. Johnson* (2012) 53 Cal.4th 519, 528; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales, Inc.*).)  We agree with the Attorney General and defendant that we are bound by *Favor*.  (*Auto Equity Sales, Inc., supra*, 57 Cal.2d at p. 455.)

Defendant also argues that the United States Supreme Court's holding in *Alleyne, supra*, 58 U.S. at page 103, undermines *Favor*.  Because *Alleyne* does not deal with natural and probable consequences in a prosecution for attempted willful, deliberate, and premeditated murder, in our view we are bound to follow *Favor*.  As we note, the continuing viability of *Favor* in light of *Alleyne* is a matter that is currently pending before the California Supreme Court.  (*People v. Lopez* (Aug. 21, 2019, B271516, review granted Nov. 13, 2019, S258175.)

12

C.    *Prosecutorial Misconduct*

Defendant argues that the prosecutor committed misconduct when she referred to prospective jurors' comments in her rebuttal argument to bolster the prosecution's factual theories and inflame the jury's passions and biases.  We agree that the prosecutor committed misconduct, but conclude the misconduct was not prejudicial.

1.    Background

During her rebuttal argument, the prosecutor addressed the testimony of Flores, Gutierrez's gang expert.  She noted that Flores "pretty much would not say that this was a gang crime on any level with any facts."  The prosecutor then said she wanted to direct the jury's attention to jury selection, stating that "some of the things that the perspective [*sic*] jurors said during that conversation, if you were listening carefully, are the exact concepts we are dealing with in this case."[8]  She then said to the jury:

"How about the man who talked about his special needs son who was crossing the street.  And he was hit up by a group of guys who said where you from, before they shot him five times and he still has five bullets in his body.

---

[8]    Only portions of the jury voir dire are in the record on appeal, so we are unable to determine the accuracy of the prosecutor's characterizations of the prospective jurors' responses.  In any event, defendant does not challenge the accuracy of the prosecutor's recitation of voir dire.

13

"How about the woman who said her god daughter's sister was part of a gang and that gang was called Gardena 13. We hadn't even mentioned what gang was involved in this case.

"How about the guy who went to Vegas, remember him."

Defense counsel objected, "Objection, your Honor, [Evidence Code section] 352." The trial court overruled the objection stating, "Argument of counsel is not evidence. Evidence is that which has been testified to, stipulations[,] and exhibits. And you've had a combination of all three."

The prosecutor resumed her argument:

"How about the man who went to Vegas. Remember him. He was pretty likeable. And he talked about gangs because he grew up around gangs and he told you the veteran gang members make the younger gang members prove themselves and they prove themselves by committing crimes.

"Now, the defense wants you to think that Martin Flores is a true gang expert. These concepts are basic and they are things that people are dealing with in the community. I didn't even need to bring a gang expert in here to explain some of these concepts. But Officer Chavez is a police officer who is risking his life every day in this neighborhood to protect the community against gang crimes. But I guess they don't want you to think that he's an expert. They want Martin Flores, who is paid $220,000 a year to testify for the defense to explain to you that this isn't a gang crime. That is not credible. And you know that."

Later, discussing whether prosecution witnesses had motives to lie, the prosecutor said to the jury, "What is the motive to lie for these kids. Honestly. Do you think they want to be here? You think they want to be going through this? You think they want to sit on that witness stand and identify known gang

14

members?  There was a very powerful moment in this trial where I was asking [a witness] what his concerns were.  And he said it in a way that I wouldn't necessarily say it and maybe you wouldn't say it.  I would probably just say straight out, I'm scared of retaliation.  What he said, though, was so powerful.  He said, I'm afraid that what I say up here, is going to affect me out there.[9]

"And if there is one thing that you all can agree on, [it] is that witnesses who testify in gang cases, do get retaliated against.  Do you remember the young girl, she was sitting right here.  She was very sharp.  She was the one that ditched school to go to Starbucks.  She was talking about her friend in Carson, who was killed on his door step.  She was like, I know who did it.  I know who did it and the police are not arresting them and she [was] frustrated.  But then when I asked her, did you pick that person out of a photo?

"Yes, I told them.

"Okay, are you willing to go to court?

"No.  She wanted nothing to do with that responsibility.  Why?  Because it [is] scarry [*sic*].  Because gang cases are scarry [*sic*].  And, so, you think these witnesses are going to come in here, that they're going to point people out in sic-packs [*sic*] and

---

9      During direct examination, the prosecutor had asked Aaron if he was nervous about testifying.  Aaron responded that he was.  The prosecutor asked what caused him to be nervous.  Aaron responded, "Just saying something I shouldn't."  The prosecutor asked, "And when you say that you're worried about saying something you shouldn't say, what do you mean?"  Aaron answered, "I just don't want to say anything that's going to put my life in threat."  The prosecutor asked, "So you have a fear of retaliation?"  Aaron responded, "Yes."

they're going to identify these defendants. If they are lying, what do they have to gain from that? Nothing."

Later, the prosecutor, discussing gang culture, said, "[Defense counsel] got up here, at the very beginning of the defense's argument and he said oh, you know, a young man got shot. And there's a cultural [*sic*] out there. Kind of breezed by it. But let's talk about the culture. And this is where I'm going to end. There is a culture of adult gang members, making juveniles commit their crimes. Why? Because gangs want to stay in business. They want to keep doing what they do, which is engage in violence on our sheets [*sic*]. And the way they're going to do it, is they're going to target our youth. They're going to go after the young boys and girls of our communities. They're going to go after the teenagers and they're going to make them do their dirty work. And that's exactly what these three defendants did. And they should be ashame[d] of themselves."

After returning from a lunch recess, defense counsel moved for a mistrial, arguing that several parts of the prosecutor's argument were inflammatory and misconduct including, as relevant here, her reference to gang shootings that were not part of the trial evidence and to the statement by the prospective juror who "went to Vegas" and had grown up around gangs that veteran gang members made younger gang members prove themselves by committing crimes. The trial court denied defendant's mistrial motion, ruling the jury had heard about the other shootings and the prospective juror's comment about the actions of "veteran gang members" during voir dire.

## 2. Standard of Review

A claim of prosecutorial misconduct is governed by the abuse of discretion standard of review. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

## 3. Analysis

""A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""" ([*People v. Powell* (2018) 6 Cal.5th 136,] 172, 237 Cal.Rptr.3d 793, 425 P.3d 1006.)" (*People v. Hoyt* (2020) 8 Cal.5th 892, 943.)

"It is well settled that it is misconduct for a prosecutor to base argument on facts not in evidence. [Citation.]" (*People v.*

17

*Mendoza* (2016) 62 Cal.4th 856, 906.)  Similarly, it is misconduct for prosecutors to "quote individual jurors in their argument to the entire jury."  (*People v. Freeman* (1994) 8 Cal.4th 450, 517.)  Nevertheless, "'it does not follow that such conduct is necessarily prejudicial in any given case.' [Citations.]"  (*Id.* at p. 518.)

### a.    Forfeiture

"[T]o preserve a claim of prosecutorial misconduct for appeal, "'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.'" [Citation.]  The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' [Citation.]"  (*People v. Hoyt, supra*, 8 Cal.5th at pp. 942–943.)

On appeal, defendant contends the prosecutor's references to statements by prospective jurors were impermissible because those statements were not evidence admitted at trial.  Those statements concerned (1) the man with the special needs son who was asked, "'Where you from?'" before being shot, (2) the woman whose goddaughter's sister was part of the Gardena 13 gang, (3) the man who had grown up around gangs and said that veteran gang members made younger gang members prove themselves by committing crimes, and (4) the woman who was afraid to testify about a gang killing.  Defendant further contends the prosecutor improperly argued that "guilty verdicts would help reduce the ability of gangs to 'target our youth,' 'go after the young boys and girls of our communities' and 'go after the teenagers and . . . make them do their dirty work.'"

The Attorney General argues that defendant forfeited most of his claims on appeal because he failed to object on the same grounds and request an admonition in the trial court. Defendant argues there was no forfeiture because any objection would have been futile as the trial court had instructed the attorneys to not interrupt each other's arguments with objections "if at all possible" and it overruled defense counsel's first objection to the prosecutor's argument.

In defense counsel's motion for a mistrial, he initially argued, "I think that it was highly prejudicial, inflammatory and misconduct for the prosecutor to bring in statements about other shootings, other gang shootings, other gun incidents outside this court, referring to mask [*sic*] killings, I believe. And I believe that . . . was strictly inflammatory and I would be moving for mistrial on behalf of [defendant] based upon that." During argument on his mistrial motion, defense counsel added, "But with that statement, a man went to Vegas . . . and [what] she's talking about . . . brings that into context with veteran gang members . . . and comparing what they do with new or young gang members, that's not a part of this case and I think was improper and insightful [*sic*] to bring that up."

Defendant's failure to object timely, or at all, in the trial court to the references to the prospective juror whose goddaughter's sister was part of the Gardena 13 gang or to the need for guilty verdicts to impede the ability of gangs to "'target our youth'" to make them do the gang's "'dirty work'" forfeits these claims on appeal. (*People v. Hoyt, supra*, 8 Cal.5th at pp. 942–943.) The futility exception to the forfeiture rule does not save these claims. That exception applies in "unusual" or "extreme" circumstances like those in *People v. Hill* (1998) 17

19

Cal.4th 800, 821, 826 where defense counsel's failure to object was excused by the prosecutor's "continual misconduct, coupled with the trial court's failure to rein in her excesses, [which] created a trial atmosphere so poisonous" that further objections "would have been futile and counterproductive" to the defendant. (*Id.* at p. 821; see also *id.* at p. 836.) No such "unusual" or "extreme" circumstances were present here.

Defendant's motion for mistrial as to the remaining claims—the references to the man with the special needs son who was shot after being asked, "'Where you from?,'" the man who spoke about veteran gang members making younger gang members prove themselves by committing crimes, and the woman who was afraid to testify about a gang killing—was sufficiently timely to preserve these claims for appeal. (See *People v. Peoples* (2016) 62 Cal.4th 718, 801 [the failure to object timely to prosecutorial misconduct did not result in forfeiture where defense counsel moved for a mistrial the following day— before defense closing arguments began—thus giving trial court the opportunity to admonish the jury before deliberations began].)

b.    Merits

As noted, after application of the forfeiture doctrine, defendant's remaining misconduct claims concern the prosecutor's references to the man whose special needs son was shot after being asked, "'Where you from?,'" the man who spoke about veteran gang members making younger gang members prove themselves by committing crimes, and the woman who was afraid to testify about a gang killing.  We agree with defendant

20

that the prosecutor, during closing argument, improperly argued facts not in the evidence (*People v. Mendoza, supra*, 62 Cal.4th at p. 906) and improperly quoted individual jurors (*People v. Freeman, supra*, 8 Cal.4th at p. 517). But the misconduct was harmless in light of the overwhelming evidence of guilt adduced at trial.

The evidence showed that defendant—an admitted member of the Gardena 13 gang who was accompanied by other Gardena 13 gang associates and members—approached Israel and issued the gang challenge, "'Where you from?'" Israel did not respond, and defendant attacked him. In the ensuing brawl, defendant said, "'This is Gardena.'" One of his companions made a gang sign with his hand and said, "'Gardena,'" and "'Fuck your dead homies.'" After slamming Israel to the ground, defendant picked up Israel and held his arms behind his back. Then defendant or one of his companions called for someone to get a "burner"—i.e. a gun. Defendant told Leonardo to shoot Israel. Defendant held Israel while Leonardo, a Gardena 13 gang member, shot Israel. Leonardo said something about the number "13." Law enforcement identified defendant from the three-second video, other witnesses identified him and described his role in the fight and shooting before and at trial.

Defendant argues that to the extent the jury relied on a direct aiding and abetting theory, it was a close case because the testimony that suggested defendant said somebody should get a gun was "very uncertain." He reasons that the jury's failure to convict either Gutierrez or Hernandez "suggests that [defendant's] mere participation in the fight would not have been enough to convince the jury that he aided and abetted the shooter."

21

Even without evidence that defendant called for someone to get a gun, the case for direct aiding and abetting was not close. Contrary to his assertion, defendant did not "mere[ly] participat[e] in [a] fight." He was the primary actor in the assault on Israel. He approached Israel, issued a gang challenge, repeatedly struck Israel, and held Israel's arms behind his back— after at least someone called for a gun—while Leonardo shot him.

Moreover, the fact that the jury did not convict Gutierrez or Hernandez tends to demonstrate that the jury did not rely on any improper remarks by the prosecutor. The prosecutor made the challenged remarks generally and not specifically in reference to defendant. Had the jury relied on any improper remarks in convicting defendant, it would have also convicted Gutierrez and Hernandez.

Finally, the trial court instructed the jury that the attorney's arguments were not evidence. We presume the jury understood and followed the court's instructions. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178, overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

D.    *Senate Bill No. 620*

Under section 12022.53, subdivision (h),[10] (which became effective January 1, 2018, pursuant to Senate Bill No. 620 (Stats.

---

[10]    "The court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd. (h).)

2017, ch. 682, § 2)), a trial court may strike a section 12022.53 firearm enhancement in the interest of justice. Defendant contends the trial court made two errors in exercising its section 12022.53, subdivision (h) discretion. First, in imposing the 25-years-to-life subdivisions (d) and (e)(1) enhancement, it relied on the fact that the case was serious, gang-related, and involved a shooting when that enhancement can only be imposed in a serious, gang-related case that involves a shooting. Second, the record suggests the court was unaware that it could strike the subdivisions (d) and (e)(1) enhancement and impose a lesser enhancement under subdivisions (b) or (c) and (e)(1). We agree that the court erred in relying on the fact that defendant's attempted murder offense was gang-related and involved a shooting in declining to strike defendant's section 12022.53, subdivisions (d) and (e)(1) enhancement.[11] Accordingly, we remand the matter for the court to exercise its informed sentencing discretion.

## 1. Background

At defendant's sentencing hearing, the trial court observed that Senate Bill No. 620 was a new law that it had addressed in two prior cases. About its application in defendant's case, the court said:

---

[11] Because we hold the trial court misperceived its discretion to strike the section 12022.53, subdivisions (d) and (e)(1) enhancement, we need not reach defendant's additional claim that the court misperceived its discretion to impose a lesser subdivisions (b) or (c) and (e)(1) enhancement.

23

"And I looked at this in terms of [defendant] with respect to, is this a case that really should be reduced and [Senate Bill No. 620] basically should be applied based upon the fact that the court does have discretion.

"But the problem with this case, [defense counsel] and [defendant], is this is a serious case and this is a gang case. And this case could have resulted in death. The only reason that it didn't, thankfully it didn't, is because of the relatively quick work by the paramedics.

"But using guns and shooting people because of gang activity is not what [Senate Bill No. 620] is all about. And so it's very difficult for the court to somehow, in good conscience and trying to be as fair to [defendant] as I can, to really consider imposing a [Senate Bill No.] 620 reduction when this is a gang case and a gang shooting.

"And [defendant] is the oldest of all these people out there. And instead of basically exercising some maturity—maybe his brain is not fully developed. But I would think a 24-year-old brain is more developed than a 15-year-old's brain, based on my life experience. But it could have been handled differently. I realize it's stupid, it's silly, and it's childish and it should not have happened.

"But it's just a serious case. And this is not a case that, as far as the court is concerned, merits the 17 years. I would love to give him the 17 years. But this is basically a gang case and a shooting. And this is not the kind of activity that [Senate Bill No. 620] basically was—how shall I put it—was passed to allow the court to exercise some discretion.

"So I looked at the cases, and because of that, [defense counsel] and [defendant], I don't see where this case is a [Senate Bill No.] 620-case at all."

### 2.    Standard of Review

We review a trial court's decision not to strike a sentence enhancement pursuant to section 1385 under the abuse of discretion standard.  (*People v. Carmony* (2004) 33 Cal.4th 367, 371.)

### 3.    Analysis

Section 12022.53, subdivision (d) provides in relevant part: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a) . . . personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."[12] Subdivision (e)(1) makes subdivision (d) applicable to a defendant who did not personally and intentionally discharge a firearm if that defendant was found to have violated section 186.22 (the gang statute) and a principal in the commission of the offense

---

[12]    Attempted murder is an offense specified in section 12022.53, subdivision (a).  (§ 12022.53, subd. (a)(1) & (18).)

25

personally and intentionally discharged a firearm in violation of subdivision (d).[13]

In sentencing defendant, the trial court observed that this was a serious case—i.e., attempted murder—and a gang case and that "using guns and shooting people because of gang activity is not what [Senate Bill No. 620] is all about." However, the only reason that defendant was subject to the section 12022.53, subdivisions (d) and (e)(1) enhancement was because he committed an attempted murder and the jury found true the gang allegation. Senate Bill No. 620, through section 12022.53, subdivision (h), conferred upon trial courts the discretion to strike all of section 12022.53's enhancements including those imposed because the defendant committed a gang-related attempted murder. (See *People v. Vela* (2018) 21 Cal.App.5th 1099, 1114 [remanding for the trial court to exercise its discretion whether to strike or dismiss the jury's true finding that during the commission of a gang-related murder and attempted murder, another principal intentionally discharged a firearm causing death and great bodily injury].) Because the trial court misperceived Senate Bill No. 620's application, remand is appropriate so the court can exercise its informed discretion.

---

[13] Subdivision (e)(1) states: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

26

E.    *Conduct Credit*

At defendant's sentencing hearing, the prosecutor appears to have argued that defendant was not entitled to any conduct credit because he was sentenced to a life term.  The trial court stated that it did not believe that defendant was entitled to conduct credit and awarded defendant 777 days of presentence custody credit and no days of conduct credit.

Section 2933.1, subdivision (c) limits the presentence conduct credit a defendant convicted of a violent felony may receive to 15 percent of the defendant's actual presentence custody.  Section 2933.2, subdivision (a) prohibits an award of conduct credit to a defendant convicted of murder.  As the Attorney General notes, section 2933.2, subdivision (a) does not apply to attempted murder.

Defendant argues that his conviction for a violent felony[14] limits his conduct credit to 15 percent of his actual presentence custody, but his life term does not bar an award of any credit.  Citing *People v. Duff* (2010) 50 Cal.4th 787, 793 ["The circumstance that a defendant is sentenced to an indeterminate sentence does not preclude the earning of presentence conduct credit"], the Attorney General agrees.  So do we.  Accordingly, defendant is entitled to 116 days of conduct credit.  (*People v. Ramos* (1996) 50 Cal.App.4th 810, 816 [a defendant is entitled to the greatest whole number of days that does not exceed 15 percent of his actual presentence custody].)

---

[14]    Violent felonies under section 667.5, subdivision (c) include attempted murder ((c)(12)) and any violation of section 12022.53 ((c)(22)).

27

## IV.   DISPOSITION

The matter is remanded to the trial court so it may exercise its discretion whether to strike any of defendant's section 12022.53 firearm enhancements and the sentencing minute order is ordered modified to reflect that defendant was awarded 116 days of conduct credit.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.

KIM, J.

I concur:

BAKER, J.

28

### *People v. Lima -- B293030*

RUBIN, P. J. – Concurring;

  I have signed the majority, but I write separately to express additional thoughts about the prosecutorial misconduct in this case. The prosecutor made a conscious decision that she would structure at least part of her rebuttal argument along the line that seemingly much of the evidence in the trial conformed to the experiences with, and fear of, gangs that several of the prospective jurors had expressed earlier in voir dire. Twenty-six lines of reporter's transcript into her rebuttal argument, the prosecutor harkened back to the lengthy voir dire process. She then argued, "And some of the things that the perspective [*sic*] jurors said in that conversation, if you were listening carefully, are the exact concepts we are dealing with this case." Her first example was the prospective juror whose son was crossing the street. Gang members threatened the son and shot him five times.

  This was not just an isolated moment of overzealousness at the end of a stressful attempted murder trial. Instead, the prosecutor proceeded to match the experiences of other prospective jurors to the evidence at trial. Off and on, for the next 18 pages of transcript, the prosecutor returned to the theme that might be described as, "The prosecution evidence must be true because something similar happened to several of the prospective jurors."

  The majority has quoted at length of the prosecutor's other invocations of the experiences of the prospective jurors. There is no need to repeat them here.

  I agree with the majority that the argument was

improper, at a minimum, because "it is misconduct for a prosecutor to base argument on facts not in evidence. [Citation.]" (*People v. Mendoza* (2016) 62 Cal.4th 856, 906.) Significantly, these were not just any "facts not in evidence," these were voir dire statements by prospective jurors who were not testifying but whose words would carry special weight, far beyond a remark improperly attributed to a person the jury had never seen. Referring to facts not in evidence has the serious potential of interfering with a fair trial. As our Supreme Court said just the other day, an argument based on facts not in evidence, " ' " 'although worthless as a matter of law, can be "dynamite" to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence.' " [Citations.]' [Citations.] ' "Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal." ' " (*People v. Rodriguez* (May 21, 2020, S251706) __ Cal.5th __ quoting *People v. Hill* (1998) 17 Cal.4th 800, 828, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Beyond referring to facts not in evidence, the prosecutor's argument seemed calculated to inflame the jury. This was a gang case – and the referenced voir dire passages all dealt with painful and sometimes horrific experiences the prospective jurors had had with gangs. Our Supreme Court has advised of the critical line between forceful advocacy and argument designed to inflame the passions of the jury. The "jury should not be given the impression that emotion may reign over reason. . . . [I]rrelevant information or inflammatory rhetoric that diverts the jury's attention from

2

its proper role, or invites an irrational, purely subjective response, should be curtailed." (*People v. Lewis* (1990) 50 Cal.3d 262, 284.)

At bottom, the prosecutor's argument violated a short but direct rule of law expressed by the Supreme Court in *People v. Freeman* (1994) 8 Cal.4th 450, 517: "[C]ounsel should not quote individual jurors in their argument to the entire jury." The prosecutor here did just that.

If this court had reversed defendant's conviction, we would have been required by statute to report the prosecutor to the State Bar, for such reporting is required, "[w]henever a modification or reversal of a judgment in a judicial proceeding is based in whole or in part on the misconduct, incompetent representation, or willful misrepresentation of an attorney." (Bus. & Prof. Code, § 6086.7; see also *People v. Hill, supra,* 17 Cal.4th at p. 853, fn. 13 [reversal of murder conviction for prosecutorial misconduct required Supreme Court to notify State Bar].)

I agree with the majority that the evidence against defendant was overwhelming, and reversal is not required. There will be no report to the State Bar. Nevertheless, it may be time to bring forward the words of our first district in *People v. Lambert* (1975) 52 Cal.App.3d 905, 911–912:

"Despite our conclusion that the misconduct here was nonprejudicial, we feel compelled to forewarn prosecutors that we have too often of late been faced with the task of determining whether unnecessarily zealous prosecutors have committed misconduct, and if so, determining whether, on the basis of the whole record, that misconduct was prejudicial. Frequently, it seems that deputy district attorneys see their sole function as

winning cases even at the expense of a fair trial for the defendant and the proper administration of justice in the courts.  These excesses then force the Attorney General's office into often extreme positions in an effort to justify the prosecutor's actions.  The Attorney General might consider whether it is more profitable to spend some time schooling such individuals in proper prosecutorial conduct.  Certainly the courts' time could be better spent than having to review the entire record in numerous cases to determine whether a reversal is mandated by prosecutorial misconduct or not.

"While this court is not inclined to find prosecutorial misconduct where we feel none exists, we do feel that the instances of such improprieties have come before us too often.  Similarly, while we are not inclined to find such conduct prejudicial if the record does not warrant such a conclusion, we feel compelled to warn prosecutors that they cannot continue with impunity to engage in such conduct thinking that appellate courts will save them by applying the harmless error rule.  Convictions have been reversed before, and will continue to be, whenever prejudicial misconduct occurs.  The Attorney General, district attorneys, and deputy district attorneys should take appropriate steps to minimize such occurrences."  (See also *People v. Denard* (2015) 242 Cal.App.4th 1012, 1023, fn. 4; *People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1537.)

RUBIN, P. J.

4